**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-02297-NYW-KAS

MATTHEW S. LOMAX, Regional Director of Region 27 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,

      Petitioner,

v.

LONGMONT UNITED HOSPITAL AND CENTURA HEALTH, as a single employer,

      Respondent.

---

## MEMORANDUM OPINION AND ORDER

      This matter is before the Court on the Complaint and Petition for Temporary Injunction Pursuant to Section 10(j) of the National Labor Relations Act, [Doc. 1], and the Memorandum of Points and Authorities in Support of the Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act, [Doc. 1-1], (collectively, the "Petition for Temporary Injunction" or "Petition") filed on September 7, 2023 by Matthew S. Lomax, the Regional Director of Region 27 of the National Labor Relations Board ("Petitioner"). Respondent Longmont United Hospital and Centura Health, as a single employer ("Respondent"),[1] responded to the Petition on September 29, 2023. [Doc. 29]. This Court held a hearing on the matter on October 25, 2023.

---

[1] Petitioner named Longmont and Centura as a "Single Employer" and as a single Respondent, *see* [Doc. 1 at 1], but the entities refer to themselves collectively as "Respondents," *see, e.g.*, [Doc. 28 at 1; Doc. 29 at 1]. The Court advised these entities that to the extent they sought to amend the case caption, they would need to file a formal motion seeking that relief. *See* [Doc. 32 at 1 n.1]. Respondent did not do so. In addition, the Court notes that the entities stipulated that they will be regarded as a single employer for purposes of the administrative case at issue in this civil action. *See* [Doc. 1-5 at 2]. Accordingly, the Court continues to refer to Longmont and Centura as a single Respondent.

[Doc. 38].   For the reasons set forth in this Order, the Petition for Temporary Injunction is **GRANTED in part** and **DENIED in part**.

## LEGAL FRAMEWORK

### I.    The National Labor Relations Act

Section 7 of the National Labor Relations Act (the "NLRA" or the "Act") provides, in relevant part, that employees "shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8 of the Act instructs that it is an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" Section 7 of the Act.  *Id.* § 158(a)(1).  Section 8 also prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  *Id.* § 158(a)(3).

Through the Act, the National Labor Relations Board (the "NLRB" or the "Board) is empowered to "prevent any person from engaging in any unfair labor practice . . . affecting commerce."  *Id.* § 160(a).  The Act "provides for the adjudication of alleged unfair labor practices through an administrative process that involves initial fact-finding and determination of the charges by an ALJ, whose decision is reviewable *de novo* by the Board."  *Chester ex rel. NLRB v. Grane Healthcare Co.*, 666 F.3d 87, 92 (3d Cir. 2011).  The Act provides federal circuit courts, not federal district courts, with appellate and enforcement jurisdiction over the Board's decisions, *see* 29 U.S.C. § 160(f), "with judicial review of final Board decisions under a standard that requires considerable deference to various Board determinations," *Chester*, 666 F.3d at 92.

In 1947, Congress amended the NLRA, through the Labor Management Relations Act of 1947 (also known as the Taft-Hartley Act), to include additional provisions. *Id.*; *Frankl v. HTH Corp.*, 650 F.3d 1334, 1340 (9th Cir. 2011). Among these new provisions was section 10(j), which permits the Board to apply for interim injunctive relief in the district courts to prevent an employer's continued unfair labor practices while an unfair-labor-practice charge against the employer is pending before the Board. *Fernbach ex rel. NLRB v. Raz Dairy, Inc.*, 881 F. Supp. 2d 452, 460–61 (S.D.N.Y. 2012). Section 10(j) states:

> The Board shall have power, upon issuance of a complaint . . . charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). This provision "reflects Congress' view that interim injunctive relief to restore and preserve the status quo, pending final Board adjudication, may be required to avoid frustration of the basic remedial purposes of the Act and possible harm to the public interest." *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 28–29 (6th Cir. 1988). District-court proceedings under § 10(j) are "merely ancillary" to the administrative proceedings conducted before the Board. *Id.* at 28. In ruling on a § 10(j) petition, the district court does not adjudicate the merits of the case, which are left to the discretion of the Board. *Id.*

Issuing an injunction under § 10(j) is "an extraordinary remedy." *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013) (quotation omitted). "The relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." *Sharp ex rel. NLRB v. Webco Indus., Inc.*, 225 F.3d 1130, 1135 (10th Cir. 2000) (quotation and alteration omitted).

## II.     Applicable Legal Standards

### A.     Granting Relief under Section 10(j)

In a standard civil action, a party seeking preliminary injunctive relief must establish (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm absent preliminary relief; (3) the balance of equities weighs in favor of granting preliminary relief; and (4) an injunction is in the public interest. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). There is a circuit split with respect to whether this traditional test applies to petitions seeking injunctive relief under 10(j), too. *See McKinney ex rel. NLRB v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 296–97 (5th Cir. 2015) (collecting cases). A number of circuit courts apply these traditional factors in ruling on petitions for temporary relief under § 10(j). *See, e.g.*, *Frankl*, 650 F.3d at 1355; *Harrell ex rel. NLRB v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir. 2013); *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

The Tenth Circuit, however, historically has disclaimed the use of this standard for § 10(j) petitions: "*rather than considering a traditional four-part equitable test* to grant a § 10(j) petition, the district court considers whether there was (1) 'reasonable cause to believe' that [the] respondent violated the Act; and (2) whether the relief sought is 'just and proper.'" *Sharp*, 225 F.3d at 1133 (emphasis added). The Third, Fifth, Sixth, and Eleventh Circuits also use this two-pronged approach. *See Creative Vision*, 783 F.3d at 297; *McKinney ex rel. NLRB v. Starbucks Corp.*, 77 F.4th 391, 397 (6th Cir. 2023); *NLRB v. Hartman & Tyner, Inc.*, 714 F.3d 1244, 1246 (11th Cir. 2013); *Chester*, 666 F.3d at 92–100 (the Third Circuit discussing the differences and similarities between the two-part test and the four-part test, finding that there is substantial overlap, but maintaining that the two-part test adequately accounts for equity considerations in § 10(j) context).

Meanwhile, at least two circuit courts use a "hybrid" approach, wherein the traditional four elements are considered when determining whether injunctive relief is "just and proper."  *See Kreisberg*, 732 F.3d at 141 (recognizing that "the 'just and proper' prong of the § 10(j) injunctive relief standard for labor disputes incorporates elements of the four-part standard for preliminary injunctions that applies in other contexts"); *Pye ex rel. NLRB v. Sullivan Bros. Printers*, 38 F.3d 58, 63 (1st Cir. 1994) (explaining that, to determine whether injunctive relief is "just and proper," "the district court must examine the whole panoply of discretionary issues with respect to granting preliminary relief" and "must apply the familiar, four-part test for granting preliminary relief" (quotations omitted)).

Respondent argues that the Tenth Circuit's two-part test for § 10(j) petitions has been supplanted by the traditional four-part equitable test, relying on *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and *Diné*, 839 F.3d 1236.  [Doc. 29 at 25–26].  In *Winter*, the Supreme Court reversed the grant of a preliminary injunction, rejecting the premise that if a plaintiff demonstrates a "strong" likelihood of success on the merits, a preliminary injunction may be issued even if there is only a "possibility" of irreparable harm.  555 U.S. at 21–22.  The Court found this standard "too lenient," and reiterated that, to obtain preliminary relief, the plaintiff *must* make the traditional four-part showing.  *Id.* at 20, 22.  And in *Diné*, the Tenth Circuit rejected the appellant's argument that the trial court should have applied a modified version of the four-factor test that lessened its burden to show a likelihood of success on the merits, holding that "[u]nder *Winter*'s rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  839 F.3d at 1281–82.  At the hearing, Respondent argued that the *Sharp* two-part test effectively relaxes the traditional four-part test,

and is thus incompatible with the Supreme Court's directive in *Winter*.  [Doc. 39 at 34:13–16].[2] Respondent urges this Court to follow the approach taken by the circuit courts that have applied the traditional four-part test to § 10(j) injunctions.  [Doc. 29 at 26–27].  At oral argument, Petitioner argued that the two-part test set forth in *Sharp* applied, but that this test essentially subsumed the four-part inquiry, because the "reasonable cause" standard was essentially equivalent to "likelihood of success on the merits," and whether the relief sought was "just and proper" was essentially equivalent to whether there was irreparable harm.  [Doc. 39 at 39:1–41:13].

The Court respectfully concludes that, despite Respondent's urging, it may not deviate from Tenth Circuit precedent.  The *Sharp* decision expressly disclaimed the use of the traditional four-part text in the § 10(j) context, and this Court is bound by that decision absent any ruling from the Tenth Circuit or Supreme Court, not the decisions of other circuits.  *See United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990) ("A district court must follow the precedent of this circuit, regardless of its views concerning the advantages of the precedent of our sister circuits."); *see also Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) (recognizing that "[d]istrict courts are bound by the law of their own circuit" and cannot "resolve splits between circuits").

In addition, the Court is not persuaded that the *Winter* or *Diné* decisions implicitly foreclose the two-part test used by the Tenth Circuit in *Sharp*.  *Winter* and *Diné* "dealt with injunctive relief in a *significantly different* context from § 10(j) relief."  *Creative Vision*, 783 F.3d at 297 (emphasis added).  This case involves the "unique statutory scheme" of the NLRA, which "authorizes district

---

[2] When citing to transcripts, the Court cites to the page and line numbers reflected on the transcript, as opposed to the page numbers generated by the United States District Court for the District of Colorado's Case Management/Electronic Case Files ("CM/ECF") system.  In all other instances, the Court cites to the page numbers generated by the CM/ECF system.

courts to grant interim injunctive relief in labor dispute cases, an entire category over which they have no jurisdiction to decide the merits." *Chester*, 666 F.3d at 96.  As explained by the Third Circuit:

> Congress designated the NLRB as the entity with the requisite expertise in unfair labor practices, and the merits of those claims are adjudicated through an administrative process that is largely independent of the courts.  This specialized scheme distinguishes § 10(j) injunctive relief from the generic context, where district courts determine whether to grant relief in cases over which they possess both the jurisdiction and competence to decide the merits.

*Id.*; *see also Kreisberg*, 732 F.3d at 141 (explaining the differences between traditional preliminary injunction cases and § 10(j) cases).  Given the substantial differences between *Winter*'s procedural posture and this case, the Court is not convinced that *Winter* or *Diné* implicitly overruled *Sharp*. *See Creative Vision*, 783 F.3d at 297 (holding that *Winter* "does not perfunctorily control here").

Furthermore, the Court notes that even courts that apply the traditional four-part test "have made modifications to the four-part test to accommodate the purposes and goals of the NLRA," *Chester*, 783 F.3d at 97, which cuts against Respondent's argument at the hearing that *any* deviation from the traditional four-part test contravenes *Winter*.  *See, e.g.*, *Harrell*, 714 F.3d at 556 (explaining that a district court need only find that the Board has "some chance" of success on the merits and the court would "give some measure of deference to the view of the ALJ" in deciding likelihood of success); *Frankl*, 650 F.3d at 1356 ("[I]n evaluating the likelihood of success, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." (quotation omitted)); *Hooks ex rel. NLRB v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1107 (9th Cir. 2022) ("This [equitable test] is viewed through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." (quotation omitted)); *Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d

534, 543 (4th Cir. 2009) ("[O]f course, district courts should apply this [four-part] test in light of the underlying purpose of § 10(j): preserving the Board's remedial power pending the outcome of its administrative proceedings.").  "If even the courts of appeals that apply the traditional four factors for preliminary injunctions to this context do not do so strictly," *Chester*, 666 F.3d at 97, the Court cannot conclude that *Winter* clearly conflicts with *Sharp* so as to warrant this Court disregarding that decision.

In sum, the Court concludes that it must still follow *Sharp* and apply the two-part test recognized in § 10(j) cases.  The Court recognizes, however, that the "two-part standard is [not] necessarily incompatible with the requirements of the traditional four-part test." *Id.* at 98; *see also Creative Vision*, 783 F.3d at 297.  Indeed, the Third Circuit has explained that the reasonable-cause prong "has substantial overlap with the likelihood-of-success inquiry," while "the 'just and proper' prong collapses the other three equitable factors into one comprehensive analysis." *Chester*, 666 F.3d at 99.  And as discussed above, even Petitioner posited at the hearing that the two tests substantially overlap.  The Court thus considers the Parties' arguments directed to the traditional four-part test as having been raised in the context of the two-part test, keeping in mind that relief under § 10(j) is "extraordinary," *Kreisberg*, 732 F.3d at 141, and that "the NLRB must establish both prongs of [the] two-part test with reasonable clarity in order to obtain injunctive relief," *Creative Vision*, 783 F.3d at 297–98.

### B.     The Two-Part Test

"In the Tenth Circuit, a district court should grant injunctive relief under Section 10(j) if (1) 'the Board establishes reasonable cause to believe that the Act has been violated,' and (2) the Court concludes that the relief sought by the Board is 'just and proper.'" *Overstreet ex rel. NLRB v. Albertson's, LLC*, 868 F. Supp. 2d 1182, 1190 (D.N.M. 2012*) (*quoting *Sharp*, 225 F.3d

at 1133).  "[T]o establish reasonable cause, the Board does not have to prove that an unfair labor practice has occurred, rather it must only produce some evidence 'that [its] position is fairly supported by the evidence.'"  *Sharp*, 225 F.3d at 1134 (quoting *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 450 (1st Cir. 1990)).  Nor must the Board demonstrate that "the precedents governing the case are in perfect harmony."  *Fernbach*, 881 F. Supp. 2d at 461 (quoting *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir. 1980)).  "The court considers only whether the Board's evidence was sufficient to 'permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board.'"  *Sharp*, 225 F.3d at 1134 (quoting *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 371 (11th Cir. 1992)); *see also Hoffman ex rel. NLRB v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001) (instructing that the Board "should be given the benefit of the doubt" on questions of fact and, with respect to questions of law, "the Board's view should be sustained unless the court is convinced that it is wrong" (quotation omitted)).

If there is reasonable cause to believe that a violation of the NLRA occurred, the Court then determines whether the requested injunctive relief is "just and proper."  *Sharp*, 225 F.3d at 1135.  Temporary injunctive relief is "just and proper" when "the circumstances of the case . . . demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted."  *Id.* (quotation omitted).  "Congress intended for Section 10(j) 'to give the Board a means of preserving the status quo pending the completion of administrative procedures.'"  *Albertson's*, 868 F. Supp. 2d at 1191 (quoting *Sharp*, 225 F.3d at 1135); *see also Angle v. Sacks ex rel. NLRB*, 382 F.2d 655, 660 (10th Cir. 1967) ("Preservation and restoration of the status quo are . . . appropriate considerations in granting temporary relief pending determination of the issues by the Board.").

### III.     The Record Before the Court

On September 19, 2023, Petitioner filed a "Motion of the National Labor Relations Board to Try Complaint and Petition for Temporary Injunction on the Basis of the Record Developed Before the Administrative Law Judge." [Doc. 22]. In that Motion, Petitioner requested that the Court "try issues in this proceeding . . . on the basis of the current record made before the Administrative Law Judge, including the transcript and exhibits, rather than [by] holding an evidentiary hearing." [*Id.* at 1]. However, Petitioner "also request[ed] that the Court grant leave to supplement such record with either oral testimony and [sic] affidavit evidence bearing on the issue of whether injunctive relief is 'just and proper' in this case, as such evidence may not [have been] germane in the administrative proceeding." [*Id.* at 7]. Respondent opposed the request to try the case solely on the administrative record and asked the Court to permit it to supplement the record with respect to the "just and proper" prong. [Doc. 28 at 2–3]. This Court granted the Motion in part, permitting the Parties to supplement the record, but only with respect to the "just and proper" prong. [Doc. 32 at 6]. Thereafter, the Parties submitted a joint Exhibit List, providing 18 additional exhibits to the Court. *See* [Doc. 35].

At the hearing, this Court admitted Exhibits 2 through 18 into evidence without objection. [Doc. 38 at 1]. However, Respondent objected to the admission of Exhibit 1, which is an affidavit from Kris Kloster, a registered nurse employed by Longmont who is part of the Longmont Unit RNs bargaining unit. *See generally* [Doc. 35-1]. Respondent did not expressly argue that Exhibit 1 is inadmissible, but instead argued that this affidavit should be given little weight because it was completed on October 16, 2023, "after the [Petitioner] had the benefit of [R]espondent's responsive papers in this case." [Doc. 39 at 30:18–22].

It is well-settled that courts deciding § 10(j) petitions "disfavor strict adherence to the rules of evidence." *McKinney ex rel. NLRB v. Starbucks Corp.*, No. 2:22-cv-2292-SHL-CGC, 2022 WL 5434206, at *2 n.5 (W.D. Tenn. Aug. 18, 2022), *aff'd*, 77 F.4th 391.  The rationale behind this approach is adherence to the general rule that the Federal Rules of Evidence do not apply in preliminary injunction proceedings.  *See, e.g.*, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).  Thus, courts often consider *all* evidence, admissible and inadmissible, in deciding requests under § 10(j), adjusting the weight afforded to the evidence accordingly.  *See, e.g.*, *Rubin v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1073 (C.D. Cal. 2015) (explaining that district courts can consider inadmissible evidence when hearing a § 10(j) petition, but that "[t]his does not mean, however, that issues concerning authentication and hearsay have no relevance at this stage of the proceedings";  these "issues properly go to weight, rather than admissibility" (quotation omitted)); *Miller v. Saipan Portopia Hotel Corp.*, No. CIV. A. 96-0044, 1996 WL 805035, at *4 (D. N. Mar. I. Dec. 11, 1996) ("[I]n a hearing for preliminary relief, the Court may properly consider affidavit evidence that would not be admissible at trial if irreparable harm may be prevented.  However, the Court should accord the inadmissible evidence an appropriate weight to reflect its reliability."  (citation omitted)); *Muffley v. Jewish Hosp. & St. Mary's Healthcare, Inc.*, No. 3:12-MC-00006-R, 2012 WL 1576143, at *7 n.3 (W.D. Ky. May 3, 2012) ("Courts have considered [hearsay] comments in the context of the just-and-proper analysis while deciding whether a preliminary injunction under § 10(j) should be granted.").

The Court will **OVERRULE** Respondent's objection.  Respondent does not contend that the affidavit is inadmissible and inadmissibility would not outright preclude the Court's consideration of the affidavit.  *Rubin*, 80 F. Supp. 3d at 1073.  And the Court is respectfully unpersuaded that the Court should decline to consider the affidavit simply because it was signed

after Respondent filed its Response.  While Respondent insisted at the hearing that "in prior 10(j) cases, affidavits that were collected in the investigatory process are the affidavits that have been typically admitted into the record," Respondent cited no legal authority for this proposition.  [Doc. 39 at 30:2–5].  The Court also notes that the affidavit discusses some events occurring *after* the administrative proceedings and after the ALJ issued his decision, such that it would have been impossible for this evidence to have been considered by the ALJ.  *See* [Doc. 35-1 at 4].  In other words, the affidavit could not have been collected during the investigatory process.  Furthermore, *both* Parties asked this Court to permit them to supplement the administrative record with additional evidence supporting the "just and proper" prong, *see, e.g.*, [Doc. 22; Doc. 28], and the Court ruled on the Parties' requests on October 11, 2023—after Respondent had filed its Response, *see* [Doc. 32].  The Court cannot fault Petitioner for waiting for the Court's ruling as to whether such evidence would be permitted to collect that evidence.  And while the Court acknowledges that Petitioner had the benefit of reading Respondent's Response prior to the preparation of the affidavit, and will keep that in mind in reviewing the affidavit, Respondent raised no substantive argument explaining why this Court should give less weight to the affidavit for this reason, and the Court is not persuaded that Petitioner gained any substantial advantage in this respect.  Finally, Ms. Kloster was present to testify, and Respondent had an opportunity to examine Ms. Kloster before the Court.  Accordingly, Exhibit 1 is **ADMITTED**.

Having determined what the Court will consider in ruling on the Petition, the Court turns to the Parties' substantive arguments.

# BACKGROUND

## I.      Factual Background

Centura Heath ("Centura") is a non-profit corporation that provides healthcare services to patients and manages labor-relations policies for various hospitals in Colorado and Kansas. [Doc. 1-3 at 9–11]. Longmont United Hospital ("Longmont") is an acute-care facility located in Longmont, Colorado, and is part of the Centura network. [*Id.* at 11; Doc. 1-6 at 222:3–17]. Longmont and Centura are a single employer for purposes of this action. [Doc. 1-5 at 2].

In April 2021, the National Nurses Organizing Committee/National Nurses United, AFL-CIO (the "Union") filed a petition to represent a bargaining unit of approximately 240 nurses. [Doc. 1-3 at 105–07; Doc. 1-6 at 164:4–7]. A mail-in representation election was held in the summer of 2021. [Doc. 1-3 at 119]. A tally of the ballots yielded 93 votes in favor of the Union; 84 votes against the Union; and 15 votes subject to challenge. [*Id.* at 123]. Respondent objected to the election and requested that it be set aside. [*Id.* at 126]. On July 26, 2021, the then-Regional Director of Region 27, Paula Sawyer, issued a decision overruling Respondent's objection, ordering that four additional votes be counted, and reserving a ruling on the remaining votes. [*Id.* at 133–42]. The additional votes were all against the Union, but because the outstanding, un-counted ballots could affect the election results, a hearing was held to resolve the challenged votes. [*Id.* at 146–49].

After the hearing, the Hearing Officer recommended that six additional ballots be counted, [*id.* at 170], a recommendation to which Respondent filed exceptions, [*id.* at 172–75]. Former Regional Director Sawyer affirmed the Hearing Officer's findings and conclusions. [*Id.* at 186]. Respondent again requested review of the Regional Director's decision, [*id.* at 188–213], which the Board denied, [*id.* at 215]. After the remaining votes were counted, the Union received 94

votes in its favor and 93 votes in opposition.  [*Id.* at 218].  On April 5, 2022, the Regional Director

issued a Certification of Representation, which certified the Union as the collective bargaining unit

of:

> All full-time, regular part-time, and per diem registered nurses, including clinical
> coordinators, clinical documentation specialists, RN Wound Ostomy employees,
> house supervisors, education instructors II, RN unit educators, and RN educators,
> employed by the Employer at its facility located in Longmont; CO 80501; but
> excluding all RNs employed by other entities, registries or agencies providing
> outside labor to the Employer, office clerical employees, nurse administrators,
> managerial employees, confidential employees, guards, and supervisors as defined
> by the National Labor Relations Act [(the "Longmont Unit RNs")].

[*Id.* at 220].[3]

Throughout the election and certification process and after, on four separate occasions,

Respondent announced wage and/or benefits increases to employees across its network.  First, on

September 27, 2021, Centura's President and CEO sent an email to "[a]ll Centura Caregivers"

announcing that, effective October 3, 2021, Respondent would be "implementing a 3% annual

across-the-board base pay adjustment"; "implementing a market adjustment for some . . . patient

care positions," with an average adjustment of 5%, in addition to the 3% "across-the-board"

increase; and "increasing [the] living wage for 4,300 associates in Colorado to $17.00 per hour."

[*Id.* at 232–35].  The email expressly excluded Longmont Unit RNs from these increases, stating:

"For our Longmont United Hospital RN associates, we are legally required to maintain the 'status

quo' until pending matters are resolved (consistent with the National Labor Relations Act, Sections

7 & 8)."  [*Id.* at 235].  After this announcement, the Union's attorney sent an email to Respondent's

---

[3] Respondent challenged the certification, and the certification was upheld by the D.C. Circuit.
*See Longmont United Hosp. v. NLRB*, 70 F.4th 573 (D.C. Cir. 2023); *Longmont United Hosp. v.
NLRB*, No. 22-1262, 2023 WL 5985294 (D.C. Cir. Sept. 11, 2023) (denying petition for *en banc*
rehearing).

attorney demanding that the wage increases be applied to the Longmont Unit RNs.  [Doc. 1-4 at 12–14].  The Longmont Unit RNs did not receive the wage increase.  [Doc. 1-6 at 104:2–8].

Respondent announced a second wage increase on November 5, 2021.  [Doc. 1-3 at 237].  Again, the President and CEO issued a memorandum to "[a]ll Centura Caregivers," this time announcing that (1) Respondent's annual tuition reimbursement benefit would increase; (2) eligible employees would be permitted a one-time opportunity to "cash out up to 80 hours of PTO"; and (3) nearly 5,000 employees would receive a "Market Based Bonus."  [*Id.* at 237–39].  The memorandum also announced that changes would be made to Respondent's signing bonus structure to provide up-front payments, rather than incremental payments.  [*Id.* at 239].  Finally, Respondent also announced that it would be "investing an estimated $15 million across the health system . . . for select positions."  [*Id.*].  The memorandum stated:

> For our Longmont United Hospital RN associates, we are legally required to maintain the "status quo" until pending matters are resolved (consistent with the National Labor Relations Act, Sections 7 & 8).  I have heard you and I know that you have gone above and beyond from day one of the pandemic (and continue to do so), but this current period of time is cloudy for all of us.

[*Id.* at 240].

On March 2, 2022, Centura's Senior Vice President and Chief People Officer announced to "[a]ll Centura Caregivers" that Respondent would "invest[] $31 million" in compensation updates.  [Doc. 1-3 at 241–43].  This memorandum announced first that over 9,000 employees would "receive an adjustment in their base pay."  [*Id.* at 243].  Second, the memorandum stated that Respondent would be implementing "two new total rewards programs"—one offering student loan assistance and the other offering childcare assistance.  [*Id.*].  Again, the March 2022 announcement excluded Longmont Unit RNs from these benefit changes, informing employees that "[f]or our Longmont United Hospital RN associates, we are legally required to maintain the

'status quo' until pending matters are resolved (consistent with the National Labor Relations Act, Sections 7 & 8)." [*Id.*].

Finally, on October 11, 2022—after the Union was certified as a representative for the Longmont Unit RNs—Respondent again announced wage increases. [*Id.* at 245–47]. In this message, Respondent announced another "3% annual across-the-board base pay adjustment for 17,800" employees and announced that the "living wage in Colorado" would increase to $18.00 per hour. [*Id.* at 247]. This message contained the same language as the other announcements excluding Longmont Unit RNs: "For our Longmont United Hospital RN associates, we will continue to maintain the 'status quo' until pending matters are resolved (consistent with the National Labor Relations Act, Sections 7 & 8)." [*Id.*].

## II.    Procedural History

The Board filed an unfair-labor-practice charge against Respondent on March 3, 2022 (the day after the third announcement), [*id.* at 103], and filed amended charges on March 29, 2022, [*id.* at 98], September 23, 2022, [*id.* at 65], and October 18, 2022, [*id.* at 47]. In the latest charge, the Board alleged violations of Sections 8 of the NLRA, specifically pointing to subsections (a)(1), (3), and (5). [*Id.*]. It issued a Complaint and Notice of Hearing on August 4, 2022, [*id.* at 77, 89], which it subsequently amended on September 27, 2022, [*id.* at 59, 62], and on November 3, 2022, [*id.* at 24, 39]. A hearing on the matter was held before Administrative Law Judge John T. Giannopoulos (the "ALJ") in November 2022. [Doc. 1-6 at 2, 213].

The ALJ issued a decision on March 28, 2023, wherein he made findings of fact and conclusions of law. [Doc. 1-7]. Relevant here, the ALJ found that by implementing wage and/or benefits increases to employees across the Centura network but expressly excluding Longmont Unit RNs from those increases, Respondent "engaged in discriminatory conduct which could have

adversely affected employee rights [under the Act] to some extent." [*Id.* at 14 (citing *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34 (1967))]. The ALJ further found, as a matter of law, that as a result of its conduct, Respondent carried the burden to show that its conduct was motivated by substantial and legitimate business objectives, and that Respondent failed to satisfy that burden. [*Id.* at 14, 16–18].

As a result, the ALJ concluded that Respondent violated Section 8(a)(1) and (3) of the Act. [*Id.* at 18, 22–23]. The ALJ recommended that Respondent be ordered to, *inter alia*, (1) cease and desist from informing employees that they will not receive increased or new wages or benefits because they participated in a representation election or implementing wage or benefits increases to employees but excluding the employees who voted in a union representation election; (2) apply the wage and/or benefit increases announced in 2021 and 2022 to the Longmont Unit RNs; and (3) make the Longmont Unit RNs whole for their exclusion from the increased wages or benefits announced in 2021 and 2022. [*Id.* at 25–26]; *see also Albertson's*, 868 F. Supp. 2d at 1189 (explaining that the ALJ's decision "constitutes a recommendation for the Board's ultimate disposition of the case" (citing 29 C.F.R. §§ 102.45, 102.46)). Both Parties filed exceptions to the ALJ's decision, *see* [Doc. 1 at ¶ 10; Doc. 29 at 4], and the exceptions are currently pending before the Board.

On September 7, 2023, Petitioner filed its Petition for Temporary Injunction, asking this Court to issue a temporary injunction enjoining Respondent and its officers, employees, and all persons acting on its behalf to cease and desist from, *inter alia*, implementing wage or benefits increases that exclude the Longmont Unit RNs and ordering Respondent to prospectively implement the 2021 and 2022 wage or benefits increases to the Longmont Unit RNs. [Doc. 1 at

14–17].  Respondent has filed its opposition to the Petition, [Doc. 29], and Petitioner did not file a reply.  This matter is ripe for resolution.

## ANALYSIS

### I.      Reasonable Cause

This Court's first task is to determine whether there is reasonable cause to believe that Respondent has engaged in unfair labor practices—namely, violating Section 8(a)(1) and (3) of the Act.  *Sharp*, 225 F.3d at 1133; *see also* [Doc. 1-1 at 7 n.1 (Petitioner explaining that he is not seeking relief with respect to any allegations under Section 8(a)(5))].  "[T]o establish reasonable cause, the Board does not have to prove that an unfair labor practice has occurred, rather it must only produce some evidence 'that [its] position is fairly supported by the evidence.'"  *Sharp*, 225 F.3d at 1134 (quoting *Asseo*, 900 F.2d at 450).  "The court considers only whether the Board's evidence was sufficient to 'permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board.'"  *Id.* (quoting *Arlook*, 952 F.2d at 371).  The burden to show reasonable cause is "relatively insubstantial" in that it requires only that Petitioner demonstrate that his legal theories are "substantial and not frivolous" and that "the facts of the case [are] consistent with [his] legal theory," *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 237 (6th Cir. 2003) (quotation omitted), and the Court "must afford significant deference to the NLRB Regional Director's determinations regarding reasonable cause," *King v. Amazon.com Servs. LLC*, No. 22-CV-01479 (DG) (SJB), 2022 WL 17083273, at *6 (E.D.N.Y. Nov. 18, 2022) (quotation omitted).  However, the Court's analysis is not a "deferential rubber stamp" of the Board's positions.  *Chester*, 666 F.3d at 98.  In making the reasonable-cause determination, the Court is mindful that it is not this Court's role to adjudicate the merits of the underlying claim.  *Id.* at 99.

Petitioner asserts that the record, including the ALJ's decision, establishes reasonable cause to believe that Respondent's actions violated the NLRA. [Doc. 1-1 at 24–28]. Respondent disagrees, arguing that there is no reasonable cause to conclude that any NLRA violation occurred. First, Respondent contends that the ALJ applied the wrong legal standard in rendering his decision; according to Respondent, the ALJ incorrectly applied the "inherently destructive" standard established in *Great Dane*, 388 U.S. 26, and should have instead considered (1) whether the respondent had an established pattern or practice of implementing benefits improvements; and (2) whether the respondent deviated from the status quo due to anti-union sentiment. [Doc. 29 at 27–30 (citing *Plasticrafts, Inc. v. NLRB*, 586 F.2d 185, 188 (10th Cir. 1978))]. Then, Respondent asserts that the ALJ incorrectly concluded that Respondent failed to demonstrate that its decision to exclude Longmont Unit RNs from wage and benefits increases was motived by legitimate business objectives, and that there is no evidence in the record that Respondent acted with anti-union animus. [*Id.* at 32–37].

Respondent's arguments read like an appeal of the merits of the ALJ's decision and are more appropriately raised before the Board. *See* 29 C.F.R. § 102.48(b) ("Upon the filing of timely and proper exceptions . . ., *the Board may decide the matter* upon the record, or after oral argument, or may reopen the record and receive further evidence . . ., or otherwise dispose of the case." (emphasis added)). Indeed, the ALJ's decision is not on appeal to this Court. Respondent has not directed this Court to *any* legal authority setting out this Court's authority to conduct a *de novo* review of the ALJ's legal analyses, *see generally* [Doc. 29], and this Court finds that any such review would be improper, as the Court lacks jurisdiction over the merits of this case, *see* 29 U.S.C. § 160(f); *Chester*, 666 F.3d at 96.

The Court notes, however, that Petitioner's arguments before this Court rely substantially on the ALJ's decision and the legal theories therein.  *See, e.g.*, [Doc. 1-1 at 24–28].  The Tenth Circuit has instructed that "[t]he Board needs to convince the district court that its theory of liability is valid, substantial, and not frivolous," *Sharp*, 225 F.3d at 1134, and other courts have directed that district courts, in the § 10(j) context, "should decline to grant relief only if the NLRB's legal or factual premises are 'fatally flawed,'" *Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir. 1999) (quoting *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995)), or if the Court is "*convinced* that [the NLRB] is wrong" on questions of law, *Hoffman*, 247 F.3d at 365 (emphasis added) (quoting *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980)).  The Court thus construes, to the extent it can, Respondent's arguments as attacking Petitioner's legal theories, not the ALJ's decision.

### A.    Applicable Law

To fully assess Respondent's first argument, a brief recitation of the applicable law is helpful.  "[T]o establish a § 8(a)(3) violation, Petitioner 'must show union or other protected activity, employer knowledge of that activity, animus or hostility toward that activity, and a causally related adverse personnel action.'"  *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 925 (D. Ariz. 2014) (quoting *Ronin Shipbuilding, Inc. & Union De Trabajadores Industriales De P.R.*, 330 N.L.R.B. 464, 465–66 (2000)); *see also Great Dane*, 388 U.S. at 33 ("The statutory language 'discrimination . . . to . . . discourage' means that the finding of a violation normally turns on whether the discriminatory conduct was motivated by an antiunion purpose."  (quoting 29 U.S.C. § 158(a)(3))).  If the Board establishes anti-union animus, the burden shifts to the employer to demonstrate that it would have taken the same action even absent the discriminatory motive.  *Muffley ex rel. NLRB v. Voith Indus. Servs., Inc.*, 551 F. App'x 825, 831 (6th Cir. 2014).  "An

employer cannot simply present a legitimate reason for its actions but must persuade by a preponderance of the evidence that the same action would have taken place even in the absence of the protected conduct." *Peter Vitalie Co.*, 310 N.L.R.B. 865, 871 (1993). Conversely, consideration of whether a violation under § 8(a)(1) occurred does not include an inquiry into the employer's motive. Rather, "[t]he test is whether the employer engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act." *In re Am. Tissue Corp.*, 336 N.L.R.B. 435, 441–42 (2001). A violation of § 8(a)(3) is also considered a violation of § 8(a)(1). *Frankl*, 650 F.3d at 1356.

However, the Supreme Court has held that evidence of an unlawful motive is not always required to establish a violation of the NLRA. In *Great Dane*, it recognized that "[s]ome conduct . . . is so 'inherently destructive of employee interests' that it may be deemed proscribed without need for proof of an underlying improper motive." 388 U.S. at 33 (quoting *NLRB v. Brown*, 380 U.S. 278, 287 (1965)). And if an employer engages in this "inherently destructive" conduct, it may be found to have violated the NLRA even if it introduces evidence that it was motivated by legitimate business considerations. *Id.* Additionally, "if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct." *Id.* at 34 (emphasis added). "[I]n either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, *the burden is upon the employer to establish that he was motivated by legitimate objectives* since proof of motivation is most accessible to him." *Id.* (emphasis added). Shortly after issuing the decision, the Supreme Court characterized the *Great Dane* holding as follows:

> [I]n [*Great Dane*], . . . we held that proof of antiunion motivation is unnecessary when the employer's conduct 'could have adversely affected employee rights to some extent' and when the employer does not meet his burden of establishing 'that it was motivated by legitimate objectives.' *Great Dane* . . . determined that payment of vacation benefits to nonstrikers and denial of those payments to strikers carried 'a potential for adverse effect upon employee rights.' Because 'no evidence of a proper motivation appeared in the record,' we agreed with the Board that the employer had committed an unfair labor practice.

*NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 380 (1967) (quoting *Great Dane*, 388 U.S. at 34–35). Following *Fleetwood Trailer*'s guidance, courts have interpreted *Great Dane* as recognizing "two categories of unfair labor practices where proof of improper motive . . . is not necessary to establish a violation of § 8(a)(3)"—first, when the conduct is "inherently destructive" of employee rights, and second, when the conduct "could have adversely affected employee rights to some extent *and* where the employer does not a establish legitimate business justification for its actions. *NLRB v. Hudson Transit Lines, Inc.*, 429 F.2d 1223, 1227–28 (3d Cir. 1970); *see also 800 River Rd. Operating Co. v. NLRB*, 784 F.3d 902, 909 (3d Cir. 2015) ("*800 River Road I*"); *Lane v. NLRB*, 418 F.2d 1208, 1211 (D.C. Cir. 1969); *NLRB v. Local 1131*, 777 F.2d 1131, 1137 (6th Cir. 1985); *Local 1384, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 756 F.2d 482, 488 (7th Cir. 1985). With respect to the second category of unlawful labor practices, *if* the employer demonstrates a legitimate justification for its actions, *then* the Board bears the burden of demonstrating an unlawful motive. *See, e.g.*, *800 River Rd. I*, 784 F.3d at 909–10; *Local 1384*, 756 F.2d at 488. Thus, when analyzing allegations under Section 8(a)(3), the Board "must make a [threshold] finding as to whether the employer engaged in one of two kinds of 'discriminatory conduct which could have adversely affected employee rights to *some* extent'"—either inherently destructive conduct, or conduct that does not meet that threshold. *800 River Rd. I*, 784 F.3d at 909.

Also relevant here, the NLRB has previously held that "*[a]bsent an unlawful motive*, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative." *In re Shell Oil Co.*, 77 N.L.R.B. 1306, 1310 (1948) (emphasis in original). "Likewise, an employer is under no obligation under the Act to make such wage increases applicable to union members, in the face of collective bargaining negotiations on their behalf involving much higher stakes." *Id.* However, while "[t]he Board's rule with respect to the granting or withholding of wage increases during union organizing is simply stated, . . . its application varies." *Associated Milk Producers*, 255 N.L.R.B. 750, 755 (1981). "An employer must take the action that it would have taken were there no union activity underway," and if the wage increase withheld from unionizing employees "is a normal one so that a normal course of action is altered because of employees' union activities, the employer violates Section 8(a)(1) and (3) of the Act." *Id.* (citing *Russell Stover Candies, Inc.*, 221 N.L.R.B. 441 (1975), and *Gates Rubber Co., Inc.*, 182 N.L.R.B. 95 (1970)). A wage increase is considered "normal," or "free from improper considerations," if it is either (a) systemwide, *id.*, or (b) part of a regular pattern of increases, *Russell Stover Candies*, 221 N.L.R.B. at 441–42. This is because a system-wide implementation or a regular pattern of wage increases "provides the evidence necessary to demonstrate that the increase was given free from union or other prohibited considerations." *Associated Milk Producers*, 255 N.L.R.B. at 755.

**B.     The ALJ's Decision**

In rendering his decision, the ALJ applied the above *Great Dane* framework, explaining that, under *Great Dane*, there are two categories of employer conduct that may be deemed unlawful without the need for proof of an unlawful motive: conduct that is "inherently destructive" and conduct that did not rise to this standard, but nevertheless "could have adversely affected employee

rights to some extent." [Doc. 1-7 at 13]. The ALJ went through each benefits announcement and concluded that each announcement amounted to "discriminatory conduct which could have adversely affected employee rights to some extent" because the Longmont Unit RNs were excluded solely because they were the subject of the representation election. [*Id.* at 14, 16–18]. Following *Great Dane*, the ALJ then turned to whether Respondent could demonstrate that its conduct was motivated by substantial and legitimate business objectives. *See* [*id.*]. The ALJ acknowledged Respondent's argument that it withheld wage increases from the Longmont Unit RNs in order to maintain the status quo with them during the representation election, but found that

> other than the language in the [September 27, 2021] memo, the only evidence presented by Respondent regarding the reason the Longmont nurses were excluded from the wage increases was the testimony of [Cathy Roberts, Respondent's Vice President], who said that she was "part of the discussions" surrounding the drafting of the September 27 memo, that the language excluding the Longmont registered nurses was included in the document "for clarity," and that it was her understanding the company was required to maintain the status quo while the outcome of the election was pending.

[*Id.* at 14]. The ALJ found that there was "no evidence presented as to who actually made the decision to exclude the Longmont nurses or [evidence] establishing how, when, or why the decision was made." [*Id.* (quotation omitted)]; *see also* [*id.* at 16–18 (the ALJ finding that there was similar insufficient evidence with respect to the latter three announcements)]. Based on what the ALJ concluded was a lack of sufficient evidence, he determined that Respondent failed to present sufficient evidence demonstrating a legitimate business justification for its actions, relying on the NLRB's recent decision in *Woodcrest Health Care Center*, 366 N.L.R.B. No. 70, 2018 WL 1991055 (Apr. 26, 2018), *enforced sub nom. 800 River Rd. Operating Co. LLC v. NLRB*, 779 F. App'x 908 (3d Cir. 2019), *as amended* (Aug. 22, 2019) ("*800 River Road II*"). *See* [*id.* at 14, 16–18].

In *Woodcrest*, in the midst of a representation election, an employer announced improvements to the healthcare benefits the company provided its employees.  2018 WL 1991055, at *1–2.  The improvements were not applicable to employees who were eligible to vote in the upcoming representation election because, the employer explained, the employer could not negotiate those employees' benefits because they were "in the critical period with the Union."  *Id.* at *1–2, 6.  Applying *Great Dane*, the Board in *Woodcrest* concluded that the employer's "withholding of improved healthcare benefits from employees in the stipulated unit while announcing an intent to grant those benefits to other employees was 'discriminatory conduct which could have adversely affected employee rights to some extent.'"  *Id.* at *5 (quoting *Great Dane*, 388 U.S. at 34).  In so concluding, the Board highlighted that there was no dispute that the employer would have extended the improved benefits to the voting employees but for the employees' protected activity, and that the employer had expressly informed employees that the reason they were excluded was because they were involved in the unionization process.  *Id.* at *5–6.  The NLRB concluded that the "foreseeable effect" of the employer's actions was to discourage employees' protected activity "by sending an unmistakable message to the [voting] employees . . . that they were being punished for their support of the Union and to warn them and others . . . that they cannot engage in organizational activity without jeopardizing" the terms and conditions of their employment.  *Id.* at *6.

Due to the employer's conduct, the burden shifted to the employer to demonstrate that its actions were motivated by legitimate business justifications.  *Id.*  The NLRB concluded that the employer failed to carry this burden.  *Id.*  Specifically, while the employer argued that the purpose behind the exclusion was to maintain the status quo with the voting employees, it "offered no evidence that this was its actual motive," such as "testimony from its officials who actually made

the decision to withhold" or evidence "establishing how, when, or why the decision was made." *Id.* Furthermore, the NLRB concluded that even if the record supported the employer's position, maintaining the status quo would not be a legitimate justification for its actions, explaining that

> The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged.

*Id.* (quoting *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964)). The Board noted that it "has long recognized that the [Supreme Court's] rationale is applicable to both the granting and the withholding of benefits," and that "due to the coercive effect of withholding benefits from eligible voters while granting them to others, an employer is required to proceed in the same manner as it would absent the presence of the union." *Id.* Finally, the Board explained that "[i]n cases involving company or system-wide adjustments in benefits, these principles apply *regardless of whether the adjustments are part of a regular pattern or, as in this case, are made on a one-time basis.*" *Id.* at *7 (emphasis added). "If the employer would have granted the benefits because of economic circumstances unrelated to union organization, the grant of those benefits"—i.e., not maintaining the status quo with respect to the unionizing employees—"would not have violated the Act." *Id.*

The ALJ here determined that the *Woodcrest* "analysis [was] applicable to the facts" of this case. [Doc. 1-7 at 13]. Drawing on the principles articulated in *Woodcrest*, he noted that an employer is required to proceed in the same manner it would have without the union's presence, regardless of whether the wage adjustments were part of the employer's regular pattern or were made on a one-time basis. [*Id.* at 15 ("Systemwide changes in wages and benefits such as the ones that occurred here are considered by the Board to be free from improper considerations without inquiry as to their historical pattern." (citing *Woodcrest*, 2018 WL 1991055, at *7))]; *see also*

*Associated Milk Producers*, 255 N.L.R.B. at 755 (an employer violates the Act if it alters its "normal" conduct, and a wage increase is "normal" if it is systemwide).  The ALJ acknowledged Respondent's reliance on *Shell Oil* in contending that it was free to selectively grant wage increases to non-union employees, but concluded that *Shell Oil* does not provide "a complete defense" to Respondent, reasoning that "*Shell Oil* simply stands for the proposition that '[a]bsent *unlawful motive*, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative.'" [Doc. 1-7 at 15 (emphasis in original) (quoting *Shell Oil*, 77 N.L.R.B. at 1310)].  But *Great Dane*, the ALJ concluded, provides the mechanism for determining whether an unlawful motive exists "in situations such as the one presented here."  [*Id.*].  And the ALJ concluded that, by granting a *systemwide* wage increase that excluded Longmont Unit RNs, Respondent "engaged in discriminatory conduct which, to some extent, could have adversely affected employee rights." [*Id.*].

As a result, the ALJ found that the burden shifted to Respondent to demonstrate legitimate business justifications for its actions.  [*Id.* at 14].  The ALJ found that Respondent did not meet this burden, emphasizing that he observed no evidence demonstrating who made the decision to exclude Longmont Unit RNs from the wage improvements or why that decision was made.  [*Id.* at 14–15].  But even if the record contained such evidence, the ALJ determined that this would still not help Respondent meet its burden, reasoning that Respondent's position that it was required to maintain the status quo "fail[ed]" because "any such interpretation of the law [was] not reasonable nor held in good faith," reasoning that

> there [was] simply no risk of violating the Act when an employer implements a
> system-wide increase, such as the one implemented here, because applying a wage
> increase system-wide "does what a regular pattern of wage increases does in other

circumstances—provides the evidence necessary to demonstrate that the increase was given free from union or other prohibited considerations."

[*Id.* at 15 (quoting *Woodcrest*, 2018 WL 1991055, at *7)].  For these reasons, the ALJ concluded that Respondent failed to meet its burden to establish legitimate business reasons underlying its conduct, such that the burden never shifted to Petitioner to come forward with evidence that Respondent had an improper motive.

### C.    Discussion

On the reasonable-cause element, Respondent first contends that Petitioner improperly relies on the "inherently destructive" framework of *Great Dane*, and should instead be required to prove (1) that Respondent had an established pattern and practice of implementing wage and benefits increases, and (2) that Respondent deviated from the status quo because of anti-union sentiment.  [Doc. 29 at 27–29].  In the alternative, it contends that there is no evidence that it acted with anti-union animus in making its wage and benefits increases, [*id.* at 34–37], and that it adequately established that it was motivated by legitimate business concerns in excluding the Longmont Unit RNs from the wage increases, [*id.* at 32–33].

At bottom, there are two questions this Court must consider: first, is the Board's legal theory of liability substantial and non-frivolous? And second, does the evidence support the Board's legal theory?  *See Starbucks Corp.*, 2022 WL 5434206, at *9.

### 1.    The Board's Legal Theory is Substantial and Non-Frivolous

Petitioner contends that Respondent violated Section 8(a)(1) and (3) of the Act when it withheld wage and benefits increases from the Longmont Unit RNs.  [Doc. 1-1 at 7].  It contends that, under *Woodcrest*, Respondent engaged in discriminatory conduct that had some adverse effect on employee rights and was required to demonstrate a legitimate business justification for

its actions.  [*Id.* at 25–27].[4]  Petitioner contends that Respondent presented "little evidence other than its witnesses' conclusory statements that its conduct was intended to maintain what it understood as the status quo" and failed to meet its burden.  [*Id.* at 28].

Respondent takes issue with Petitioner's legal theories.  First, Respondent contends that Petitioner incorrectly relies on the *Great Dane* "inherently destructive" standard and should have, at the administrative level, been required to prove that (1) Respondent had a pattern or practice of implementing wage or benefits increases and (2) Respondent deviated from that practice due to an anti-union sentiment.  [Doc. 29 at 28].  However, Petitioner does not contend that Respondent's conduct was "inherently destructive" of employee rights (and, indeed, neither did the ALJ make this finding).  Instead, Petitioner contends that Respondent's conduct fits into the *second* category of conduct recognized in *Great Dane*—conduct that could have adversely affected employee rights to some extent.  *See* [Doc. 1-1 at 28]; *see also, e.g.*, [Doc. 1-7 at 13–14].  Petitioner's position that this category of conduct, like conduct that is inherently destructive, does not shift the burden to Petitioner to demonstrate an unlawful motive until Respondent presents evidence of a legitimate business objective, is supported by legal authority, *see, e.g.*, *Woodcrest*, 2018 WL 1991055, at *3; *800 River Rd. II*, 779 F. App'x at 912, and the Court concludes that it is substantial and non-frivolous.[5]  Second, to the extent Respondent argues that Petitioner should be required to prove

---

[4] Petitioner's argument largely recounts what the ALJ did in his decision.  *See* [Doc. 1-1 at 24–28].  The Court construes this as an affirmative argument adopting the ALJ's rationales.

[5] Respondent also filed a Notice of Supplemental Authority directing this Court to *Starbucks Corp.*, No. JD(SF)-29-23, 2023 WL 6379600 (Sept. 28, 2023), arguing that this ALJ decision "reinforces" its position that *Great Dane* does not apply here.  *See* [Doc. 33 at 3].  In this case, Starbucks announced that its employees would receive "wages and benefit enhancements," but only at non-unionized stores.  *See* 2023 WL 6379600.  The ALJ declined to find that this conduct was "inherently destructive" under *Great Dane*, finding that

> While the Board has found that deliberately withholding an existing benefit (i.e., one deemed to constitute an established term and condition of employment) based on employees' union membership is inherently destructive, . . . it has not explicitly

that it deviated from an established pattern or practice when it excluded the Longmont Unit RNs from the wage increases, *see* [Doc. 29 at 28], the Court simply notes that the Board has previously held that when an employer enacts a normal (i.e., systemwide) increase in benefits, but excludes union employees, it violates the Act. *Associated Milk Products*, 255 N.L.R.B. at 755. In this circumstance, no inquiry into the employer's historical practices is necessary. *See Woodcrest*, 2018 WL 1991055, at *7.

To the extent that the above cases could be construed as contradicting *Shell Oil*, this Court's role in the § 10(j) context "is not to make a definitive determination of federal labor law in this area or whether a violation [of the Act] has actually occurred." *Calatrello v. Rite Aid of Ohio, Inc.*, 823 F. Supp. 2d 690, 698 (N.D. Ohio 2011). And Petitioner need not show a "perfect harmony" of legal precedents to demonstrate that his legal theories are substantial. *Fernbach*, 881 F. Supp. 2d at 461

As to Respondent's next argument that "Petitioner relies upon portions of *Woodcrest* which were criticized or overturned by the Third Circuit in [*800 River Road II*],"[6] *see* [Doc. 29 at 32],

---

held that taking the same action with respect to a *new* benefit likewise merits an inference of discriminatory purpose.

*Id.* The ALJ found that, to apply the "inherently destructive" standard, she would need to overrule *Shell Oil*, which only the Board can do. *Id.* However, the Court is not persuaded that this ALJ decision renders Petitioner's legal position fatally flawed. First, Respondent does not explain the weight that can or should be given to this administrative decision, which has "no enforceable effect unless and until it is adopted by and becomes the order of the Board." *Kobell ex rel. NLRB v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1406 (6th Cir. 1992). Second, as explained above, Petitioner does not argue that Respondent's conduct was "inherently destructive" of employee rights, but rather, that it could have some adverse effect on employee rights (i.e., the second category of conduct recognized in *Great Dane*). [Doc. 1-1 at 26]. And finally, to the extent that Respondent contends that the ALJ "applied the improper legal standard by analyzing the Section 8(a)(3) allegations under *Great Dane*," [Doc. 33 at 3], this argument is more appropriately presented to the Board.

[6] In this statement, Respondent cites to the 2015 *800 River Road I* decision which affirmed in part, vacated in part, and remanded a 2013 Board decision in *Woodcrest*. *See* [Doc. 29 at 32]; *see also 800 River Rd. I*, 784 F.3d at 905. The Court assumes that Respondent intended to cite to the 2019

this is simply inaccurate.  Respondent suggests in its brief that the Third Circuit "made clear that future litigants should be skeptical of the *Woodcrest* Board's analysis" because the *Woodcrest* Board did not make a threshold determination as to whether the employer's conduct was inherently destructive or comparatively slight.  [*Id.* at 32–33].  The Third Circuit made no such implication, and in fact, *expressly stated* that the Board was *not* required to make this threshold determination.

In *800 River Road II*, the Third Circuit stated:

> Woodcrest argues that the Board erred because although it found Woodcrest's behavior to be discriminatory, it failed to specify whether Woodcrest's conduct was inherently destructive or comparatively slight.  And, it argues, this court previously said the Board *must* make that threshold determination.  Here, though, the Board found only that Woodcrest's conduct was "discriminatory conduct which could have adversely affected employee rights to some extent."

> True, the Board did not say whether Woodcrest's conduct was either (1) inherently destructive, or (2) comparatively slight.  But we note first that the Board made the explicit finding that Woodcrest discriminated in ways that affected employees. Then, the Board employed the burden-shifting approach outlined in *Woodcrest I*. The Board concluded that Woodcrest failed to present substantial and legitimate business justifications for its behavior and thus sided with the union.  This fits with what *Great Dane* itself did.  If the Board finds (1) discriminatory conduct that (2) the employer has no substantial and legitimate justification for, then there is no need to differentiate between whether the conduct was "inherently destructive" or comparatively slight.  Even Woodcrest says so.  If we remand to the Board, nothing in the Board's analysis would change because it already followed the burden-shifting framework this court outlined.

> . . .

> Here, the Board made a threshold determination that Woodcrest engaged in discriminatory conduct that could adversely affect employee rights.  As this court instructed in *Woodcrest I*, once the Board reaches this conclusion, the burden shifts to the employer to come forward with evidence of legitimate and substantial business justifications for the conduct . . . .  Thus, at the point that the Board found Woodcrest's actions were discriminatory, the burden shifted to Woodcrest to justify its actions.

_____

*River Road II* decision, which reviewed the 2018 *Woodcrest* decision—the decision upon which Petitioner relies.  *See* [Doc. 1-1 at 25–28]; *see also* [Doc. 1-7 at 15–18 (the ALJ relying on the 2018 *Woodcrest* decision)].

*See* 779 F. App'x at 913–14 (underlined emphasis added; quotations, citations, and some emphasis omitted).  The selective quotation used by Respondent in its brief fails to accurately describe the *800 River Road II* holding, *see* [Doc. 29 at 32], and the Court finds no fatal flaw in Petitioner's reliance on *Woodcrest*.

In sum, there is authority supporting Petitioner's positions that (1) systemwide increases in pay that exclude unionizing employees violate the NLRA, *Associated Milk Producers*, 255 N.L.R.B. at 755; (2) Respondent's conduct is properly analyzed under *Great Dane* as conduct that could have adversely affected employee rights, *Woodcrest*, 2018 WL 1991055, at *8, and (3) in this context, the burden shifts to Petitioner to establish an unlawful motive only after the employer shows a legitimate business justification for its actions, *id.* at *3; *800 River Rd. II*, 779 F. App'x at 912.  Despite Respondent's insistence that its conduct was permitted under *Shell Oil*, it is not this Court's duty to definitively rule whether a violation of the Act occurred in this case. *Calatrello*, 823 F. Supp. 2d at 698.  Because the Court is not convinced that Petitioner's reliance on this line of authority is wrong, the Court defers to Petitioner's legal position.  *See King*, 2022 WL 17083273, at *8.  The Court concludes that Petitioner's legal theories are substantial, valid, and not frivolous.

### 2.    Petitioner's Legal Theories are Supported by Sufficient Evidence

The Court next considers whether sufficient facts exist to support Petitioner's legal theories.  *Starbucks Corp.*, 2022 WL 5434206, at *9.  Evidence is sufficient if it would "permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board." *Sharp*, 225 F.3d at 1134 (quotation omitted).  In making this determination, the Court views the evidence in the light most favorable to the Board.  *Id.*

The evidence shows that in April 2021, the Union filed a petition to represent the Longmont Unit RNs.  [Doc. 1-3 at 105–07; Doc. 1-6 at 164:4–7].  A mail-in election was held in the summer of 2021, and while an initial vote tallied more votes in favor of the Union than against it, [Doc. 1-3 at 119, 123], the election was subject to a number of challenges and subsequent reviews, [*id.* at 126, 133–42, 172–75, 188].  On September 27, 2021, after the original tally favored the Union, Respondent announced systemwide wage and benefits increases that excluded the Longmont Unit RNs.  [*Id.* at 234–35 (announcing "across-the-board" increases)].  And on three separate other occasions, during and shortly after the lengthy election and certification process, Respondent announced other wage and/or benefits increases that expressly excluded the Longmont Unit RNs.  [*Id.* at 239–40, 243, 245–47].  The fourth announcement, too, was announced as an "across-the-board base pay adjustment" and also described an increase of the "living wage in Colorado."  [*Id.* at 247].  Respondent informed its employees, including the Longmont Unit RNs, that the basis for excluding these nurses from each of the increases was the ongoing unionization efforts.  [*Id.* at 235, 240, 243, 247].

Cathy Roberts ("Ms. Roberts") testified at the administrative hearing that she was "part of the discussions" that led to the first announcement.  [Doc. 1-6 at 249:7–9].  She also stated that the exclusionary language related to Longmont Unit RNs was included "[f]or clarity."  [*Id.* at 249:14–16].  She explained that it was her "understanding that [Respondent was] required to maintain the status quo" because "[t]he election was still pending."  [*Id.* at 249:17–22].  She also claimed familiarity with the circumstances surrounding the latter three announcements.  [*Id.* at 253:23–25, 255:2–4, 258:19–21].  As for the October 2022 announcement, Ms. Roberts stated that, with respect to the reference to the "status quo," Respondent was "considering at the time the implications and planning for if we needed to bargain."  [*Id.* at 251:3–7].  But there was no

testimony addressing who made the decision to exclude Longmont Unit RNs or demonstrating how or when the decision was made. *See generally* [*id.*].

The evidence, construed in the light most favorable to the Board, supports the Board's legal position that, at least with respect to the "across-the-board" increases, Respondent engaged in discriminatory conduct that could have adversely affected employee rights, such that the burden shifted to Respondent to provide a legitimate business justification for its actions. *Great Dane*, 388 U.S. at 34; *Woodcrest*, 2018 WL 1991055, at *6. To the extent that Respondent argues that its conduct did not have any actual effect on employees' exercise of Section 7 rights, *see* [Doc. 29 at 31], the Court must construe all facts and evidence in Petitioner's favor and does not resolve factual disputes in its reasonable cause analysis. *See Denholm v. Smyrna Ready Mix Concrete, LLC*, No. 5:20-cv-00320-REW, 2021 WL 297571, at *6 (E.D. Ky. Jan. 28, 2021) ("Fact questions aside, the Board's assertions have record support."). Furthermore, Respondent's apparent failure to present evidence demonstrating "how, when, or why the decision was made" to exclude Longmont Unit RNs supports the ALJ's conclusion that Respondent failed to meet its burden of establishing a legitimate business objective for its decision. *Woodcrest*, 2018 WL 1991055, at *6. To the extent Respondent argues that "*Woodcrest* did not create a bright-line rule that the desire to maintain the *status quo* and avoid an unfair labor practice charge is *per se* not a legitimate justification," *see* [Doc. 29 at 33], this argument is more appropriately raised before the Board, not this Court, whose sole responsibility is to determine whether the evidence would "permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board" and whether Petitioner's legal theories are non-frivolous. *Sharp*, 225 F.3d at 1134 (quotation omitted).

Finally, to the extent that Respondent contends that there is no evidence of anti-union animus in the record, *see* [Doc. 29 at 34–37], the Court need not reach this argument due to its above conclusion that Petitioner's burden-shifting theory under *Great Dane* is non-frivolous.  And even so, this Court does not weigh evidence or resolve factual disputes in the § 10(j) context, but instead construes the evidence in the light most favorable to Petitioner.  *Sharp*, 225 F.3d at 1134; *Denholm*, 2021 WL 297571, at *6.  Because the evidence supports the theory that Respondent engaged in conduct which could adversely affect employee rights, and because the evidence supports Petitioner's theory that Respondent failed to meet its burden of establishing a legitimate business objective for its conduct, the burden did not shift to Petitioner to come forward with evidence of anti-union animus.

In sum, construing all facts and evidence in Petitioner's favor and crediting Petitioner's legal theories, the Court finds that Petitioner's version of events would permit a reasonable fact finder to find that Respondent "interfere[d] with, restrain[ed], or coerce[d] employees in the exercise" of Section 7 rights, in violation of § 8(a)(1), *see* 29 U.S.C. § 158(a)(1), or "discriminat[ed] in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization," in violation of § 8(a)(3), *see id.* § 158(a)(3).  As a result, the Court concludes that there is reasonable cause that Respondent violated the NLRA.

## II.     Whether Interim Relief is Just and Proper

Having determined that there is reasonable cause to believe a violation of the Act occurred, the Court must determine whether temporary injunctive relief is "just and proper."  *Sharp*, 225 F.3d at 1135.  Temporary injunctive relief is "just and proper" when "the circumstances of the case . . . demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted."  *Id.* (quotation omitted).  The Court considers the policies underlying

§ 10(j), "including the public interest in the settlement of labor disputes through collective bargaining, . . . and whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers," *Chester*, 666 F.3d at 102 (quotations omitted), and whether temporary relief will "guard against harm to the collective bargaining rights of employees," *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 469 (2d Cir. 2014). The Court also considers whether temporary relief will act to preserve the status quo pending the ultimate resolution of the merits by the Board. *See Albertson's*, 868 F. Supp. 2d at 1191 ("Congress intended for Section 10(j) 'to give the Board a means of preserving the status quo pending the completion of administrative procedures.'" (quoting *Sharp*, 225 F.3d at 1135)).

Petitioner requests two categories of relief. First, he seeks a cease-and-desist order directing Respondent to cease and desist from (1) informing employees that they will not receive increased or new wages or benefits because they participated in a union representation election and (2) implementing wage or benefits increases that exclude the Longmont Unit RNs. [Doc. 1 at 14–15]. Second, he requests that this Court affirmatively order Respondent to implement the previously announced wage and benefits improvements for all Longmont Unit RNs. [*Id.* at 15].[7] He also asks the Court to order Respondent to disseminate this Order to its employees, including by holding a meeting at which the decision is read, posting the Court's order at Respondent's facilities, and emailing the Court's order to Respondent's employees. [*Id.* at 15–17].

Petitioner argues that the requested interim relief is just and proper because the Union has lost support amongst the Longmont Unit RNs due to Respondent's actions and will continue to

---

[7] Petitioner does not request that this Court order Respondent to provide backpay to the Longmont Unit RNs or to otherwise grant retroactive relief. *See* [Doc. 1 at 15–17].

lose support if Respondent continues to withhold the wage and benefits increases from the nurses. [Doc. 1-1 at 29–30].  He asserts that employee participation in Union activities has dwindled and that the bargaining unit has "been decimated as employees leave due to Respondent's unlawful actions."  [*Id.* at 31].  He contends that this lost support "will not be restored by a final Board order" but, instead, by the time the Board issues a final order, "it will be too late; employees will have given up on their Union or left the job entirely."  [*Id.* at 30].  Furthermore, Petitioner notes that the Parties are set to begin bargaining, and interim relief is necessary to increase Union support and to ensure that the Union does not enter negotiations "from a disadvantaged position, . . . attempting to secure for the [Longmont Unit RNs] employment terms they already should have." [*Id.* at 31–32].

At the hearing, Petitioner directed the Court to Ms. Kloster's affidavit in support of his argument that injunctive relief is just and proper.  Ms. Kloster has worked as a nurse at Longmont for over 20 years.  [Doc. 35-1 at 2].  She attests that "[s]ince the Union first filed a petition for election," she has "seen a great number of nurses leave."  [*Id.*].  She estimates that there are approximately 40 to 50 nurses remaining in the bargaining unit, though she does not specify how this number has changed since the election petition was filed.  [*Id.*].  Ms. Kloster states that, in September of 2023, a nurse resigned from her employment at Longmont and that "she was told that [the nurse] was tearful when she left, and said as soon as we got this all figured out (referring to the wage withholdings), she would come back."  [*Id.* at 3].  She also references another nurse who "held on as long as she could but just recently put in her resignation," and another nurse who transferred to Longmont from another Centura hospital but left after she realized she would receive less pay and would not be eligible for benefits at Longmont.  [*Id.*].  Ms. Kloster says that "a lot" of the operating room nurses want to stay at Longmont, but "they are at their limit and are starting

to feel that they cannot afford to be paid nearly $6 per hour less than the nurses at other hospitals, especially those within the same system."  [*Id.*].  She also states that she has heard, through the house supervisor, that "a lot of the people that are leaving are single-income people or new grads who have student loans, for whom not getting the pay increases has caused them to move on." [*Id.*].

*Prospective Wage Increases Based on Prior Wage Increases*.  Turning first to Petitioner's argument that the Court should order Respondent to grant the prior wage increases granted to non-bargaining employees to the Longmont Unit RNs prospectively, the Court cannot conclude that such affirmative relief is just and proper here.  At the outset, the Court notes that Petitioner has not directed this Court to *any* legal authority in which a district court ordered an employer to increase employees' wages or benefits based on withheld wage increases in the course of granting a § 10(j) petition for relief that was based on the unlawful withholding of benefits, *see* [Doc. 1-1 at 29–33],[8] and the Court could find no such authority in its independent research.  *Compare Kinard v. DISH Network Co.*, 228 F. Supp. 3d 771, 781, 785 (N.D. Tex. 2017) (ordering employer to *restore* employees' wages to the amount employees received before the employer unlawfully unilaterally

---

[8] The Court has reviewed the cases cited in Petitioner's brief, including the cases specifically highlighted by Petitioner at the hearing as being factually and procedurally analogous to this case. None of these cases involves a district court affirmatively ordering an employer to increase its employees' wages in the context of ruling on a § 10(j) petition. *See Moore-Duncan ex rel. NLRB v. Horizon House Dev. Servs.*, 155 F. Supp. 2d 390, 398 (E.D. Pa. 2001) (in § 10(j) case, ordering employer to commence good-faith bargaining with union and to process union grievances about employees being denied overtime pay); *Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995, 999 (7th Cir. 2000) (appellate decision granting enforcement of Board order directing reinstatement of employees and back pay); *Kreisberg*, 732 F.3d at 143 (appellate court affirming district court's grant of § 10(j) petition, which precluded employer from unilaterally modifying employees' existing benefits, overtime, and sick leave during CBA negotiations); *Deming Hosp. Corp. v. NLRB*, 665 F.3d 196, 203 (D.C. Cir. 2011) (appellate court granting enforcement of Board decision ordering back pay to employees after employer unlawfully unilaterally reduced their hours).

reduced employee wages), *aff'd*, 890 F.3d 608 (5th Cir. 2018).  Indeed, such a prospective wage increase based on prior wage increases seems to amount to the ultimate relief sought.

It is well established that this Court, like all district courts, lacks jurisdiction over the merits of the Parties' present labor dispute.  This Court has serious jurisprudential concerns that granting this requested affirmative relief comes too close to reaching the merits of this case while the Parties' exceptions are pending before the Board.  *See Murphy ex rel. NLRB v. Hogan Transps., Inc.*, 581 F. App'x 36, 39 (2d Cir. 2014) (finding that the district court's order awarding an individual employee back pay "exceed[ed] the district court's authority under Section 10(j), which only provides a district court 'jurisdiction to grant to the Board such *temporary* relief or restraining order as it deems just and proper" (emphasis in original) (quoting 29 U.S.C. § 160(j)); *cf. Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) (stating that "section 10(j) should be applied in the public interest and not in vindication of purely private rights, so as to further the policies of the Act" (quotation omitted)).  This Court can only grant the relief that is "reasonably necessary to preserve the ultimate remedial power of the Board and *is not to be a substitute for the exercise of that power*."  *Sharp*, 225 F.3d at 1135 (emphasis added and quotation omitted).

Furthermore, the Court cannot conclude that this prospective, affirmative relief would appropriately preserve the status quo pending a final resolution from the Board.  Petitioner does not explain why affirmatively ordering Respondent to implement withheld wage increases would preserve the status quo.  *See* [Doc. 1-1 at 29–33].  At the hearing, Petitioner stated that granting the requested relief would "restore the employees' and the Union's bargaining position to *what it should have been* had it not been for [the] employer's unlawful act."  But the status quo is "that which existed *before* the charged unfair labor practices took place," *Fleischut*, 859 F.2d at 30 n.3 (emphasis in original), i.e., the status of benefits prior to Respondent's first wage-increase

announcement on September 27, 2021.   Affirmatively ordering Respondent to increase the Longmont Unit RNs' wages to what Petitioner contends they "should have been" but for Respondent's alleged unlawful activities would not "re-establish the conditions as they existed before the employer's unlawful [conduct]," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 (1969), but would instead *alter* the status quo for the Longmont Unit RNs, and would thus not further the purposes of § 10(j).   *See Cowen v. Mason-Dixon Int'l*, No. 2:21-cv-05683-MCS-JC, 2021 WL 3852184, at *5 (C.D. Cal. Aug. 27, 2021) (denying § 10(j) petition where "[i]nstead of restoring the status quo, the requested relief would generate an entirely new set of circumstances untethered to the situation" before the employer's alleged unlawful practice); *compare NLRB v. Irving Ready-Mix Inc.*, 780 F. Supp. 2d 747, 754, 776 (N.D. Ind. 2011) (granting § 10(j) petition and ordering employer to restore employees' previous wages to the status quo after the employer unilaterally reduced the employees' wages that they were paid under collective bargaining agreement), *aff'd sub nom. Lineback ex re. NLRB v. Irving Ready-Mix, Inc.,* 653 F.3d 566 (7th Cir. 2011); *Kinard*, 228 F. Supp. 3d at 785.

The Court also considers "whether the failure to grant interim injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers."   *Chester*, 666 F.3d at 102 (quotation omitted).   Petitioner argues that the Union has lost and continues to lose support and that, absent injunctive relief, Union support "will likely dissipate entirely."   [Doc. 1-1 at 31]; *see also* [*id.* at 30 ("This lost support for the Union will not be restored by a final Board order in due course.   By the time the Board issues its final order, it will be too late; employees will have given up on their Union or left the job entirely.")].   To be sure, potential erosion of union support is a factor to consider in the § 10(j) analysis.   *See, e.g., Morgan v. Holy Cross Youth & Fam. Servs., Inc.*, No. 13-14686, 2014 WL

688190, at *5–6 (E.D. Mich. Feb. 21, 2014) ("The Sixth Circuit and other courts in this District have found that a Petitioner's concern of an erosion of union support is a compelling reason to render temporary injunctive relief 'just and proper.'"); *Blyer ex rel. NLRB v. One Stop Kosher Supermarket, Inc.*, 720 F. Supp. 2d 221, 226 (E.D.N.Y. 2010) ("[T]he Second Circuit has recognized, on several occasions, that loss of union bargaining strength constitutes irreparable harm."). And the need for interim relief may be "heightened [where] the Union was certified but Respondent and the Union have yet to achieve an initial collective bargaining agreement covering the unit employees." *Lund v. Case Farms Processing, Inc.*, 794 F. Supp. 2d 809, 822 (N.D. Ohio 2011).

However, Petitioner offers little evidentiary support for his position that Union support will continue to erode to the point that, by the time the Board issues its final order, Union support "will likely dissipate entirely." [Doc. 1-1 at 31]. Petitioner's brief contains several generalized assertions concerning lost Union support and the effects thereof, with many string citations to legal authority but no citations to record evidence. *See* [*id.* at 29–33]. For example, Petitioner asserts that "[t]he Union has heard from formerly pro-Union employees the desire to end the Union effort due to Respondent discriminatorily granting benefits and wage increases only to unrepresented employees." [*Id.* at 31]. This statement is not supported by a citation to evidence, and it is not this Court's duty to search through the record for evidence in support of this assertion. *See Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003). Similarly, Petitioner's suggestion that absent an affirmative order requiring Respondent to increase the Longmont Unit RNs' wages, "no meaningful, productive good-faith bargaining will occur under the Board's final order," is unsupported and unexplained. [Doc. 1-1 at 32].

The Court notes that Petitioner has directed the Court to evidence that there were approximately 240 nurses in the unit when the election petition was filed, [Doc. 1-6 at 164:4–7], and Ms. Kloster asserts in her affidavit that there are only 40 to 50 nurses remaining in the unit, [Doc. 35-1 at 2]. In addition, Sierra Spaulding, the lead Union organizer, testified at the administrative hearing that of the 119 nurses who originally signed authorization cards, 76 no longer work for Longmont. [Doc. 1-6 at 163:7–12, 164:18–22, 172:15–20]. But there is little evidence clearly connecting these employees' departures with Respondent's lack of wage increases for Longmont Unit RNs. At best, Petitioner directs the Court to Ms. Kloster's affidavit, wherein she attests that she "*was told*" that one resigning nurse said she would come back if wages were increased, and that the house supervisor "*has told* [her]" that many departing nurses have moved on for lack of pay increases. [Doc. 35-1 at 3 (emphasis added)]. And at the hearing, Ms. Kloster testified that nurses had expressed to her that the reason they were leaving Longmont was because Respondent had been withholding wage and benefits increases, but she did not state how many nurses or the identities of those nurses. The Court respectfully cannot assign great weight to this evidence, which does not identify these nurses or provide much detail demonstrating personal knowledge of the bases for their departure. *See Kinard*, 228 F. Supp. 3d at 782 (concluding that the weight of testimony was "lessened by the speculative and hearsay nature of some of the testimony"). This Court respectfully declines to fill gaps in Petitioner's evidence as to why these employees left Respondent's employ with speculation.

"To confine § 10(j) injunctive relief to its proper role, the NLRB must show, and the district court must find, that the unfair labor practice, in the context of that particular case, has caused identifiable and substantial harms that are unlikely to be remedied effectively by a final administrative order from the NLRB," *Creative Vision*, 783 F.3d at 299, and the Court cannot "rely

on speculative and generalized harms," *Kinard*, 228 F. Supp. 3d at 778 (quotation omitted). Petitioner has not demonstrated that his request for affirmative relief, in the form of ordering Respondent to increase the Longmont Unit RNs' wages prospectively prior to a final decision from the Board, will preserve the status quo or is an appropriate exercise of this Court's confined authority. *See Sharp*, 225 F.3d at 1135. For this reason, the Court cannot conclude that ordering prospective pay increases that have previously been granted to other non-Union nurses to the Longmont Unit RNs would be just and proper under § 10(j).

 ***Cease-and-Desist Order***. Petitioner also asks this Court for a cease-and-desist order directing Respondent to cease and desist:

> (a) Informing employees that they will not receive increased or new wages, bonuses, and/or benefits because they participated in a union representation election;

> (b) Implementing increased or new wages, bonuses, and/or benefits to employees but excluding those employees who voted in a union representation election because they exercised their rights guaranteed under Section 7 of the Act; and

> (c) In any like or related manner unlawfully interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under Section 7 of the Act.

[Doc. 1 at 14–15]. Petitioner asserts that this sort of directive "is a routine provision in any Section 10(j) preliminary injunction" and "is necessary to restrain Respondent from engaging in future unlawful conduct and assures employees that their statutory rights will be protected." [Doc. 1-1 at 33]. Petitioner makes no additional argument explaining the necessity of a cease-and-desist order. *See* [*id.* at 33–34]. Nor does Respondent raise any argument against this specific type of interim relief. *See generally* [Doc. 29].

 "[C]ease and desist orders are appropriate in order to prevent employers from engaging in unfair labor practices." *King*, 2022 WL 17083273, at *9 (collecting cases). This type of relief is

"clearly 'proper' insofar as it simply reconfirms [an employer's] existing obligations" under the Act. *Mattina ex rel. NLRB v. Kingsbridge Heights Rehab. & Care Ctr.*, No. 08 CIV. 6550 (DLC), 2008 WL 3833949, at *25 (S.D.N.Y. Aug. 14, 2008), *aff'd*, 329 F. App'x 319 (2d Cir. 2009); *see also Blyer ex rel. NLRB v. P & W Elec., Inc.*, 141 F. Supp. 2d 326, 330 (E.D.N.Y. 2001) ("A cease and desist order is clearly appropriate in order to prevent respondent from engaging in any future unfair labor practices that might undermine the union's organizing campaign."). "Such measures are employed as appropriate means for giving employees assurances that their rights will be protected." *King*, 2022 WL 17083273, at *9.

Petitioner represented at the hearing that Respondent recently made a fifth announcement of wage increases that excluded Longmont Unit RNs. And in Ms. Kloster's affidavit, she states that "just recently, around the middle of September 2023, [Longmont employees] got another email that came out where Peter Banko, now speaking as a representative for Commonspirit,[9] said that nurses throughout the system would be getting wage increases but not the Longmont nurses." [Doc. 35-1 at 3 (footnote added)]. Petitioner has not submitted a copy of this wage announcement, *see generally* [Doc. 35], which prevents this Court from fully understanding the nature of Respondent's announcement, but the Court finds Ms. Kloster's statement credible and finds no reason to question her representation that Longmont Unit RNs were recently excluded from another systemwide wage increase. Moreover, the Court notes that some courts have held that evidence of continuing violations is not "a necessary prerequisite" to a cease-and-desist order. *See Ahearn ex rel. NLRB v. Audubon Reg'l Med. Ctr.*, 937 F. Supp. 617, 630 (W.D. Ky. 1996); *Schaub v. Spen-Tech Mach. Corp.*, 925 F. Supp. 1220, 1228 (E.D. Mich. 1996); *cf. Gottfried ex rel. NLRB*

---

[9] Petitioner has not identified "Commonspirit" or its connection to this case. Ms. Kloster's affidavit and testimony at the hearing suggest that Centura is now known as Commonspirit. *See* [Doc. 35-1 at 2].

*v. Purity Sys., Inc.*, 707 F. Supp. 296, 302 (W.D. Mich. 1988) ("[C]essation of violations is insufficient ground for denying interim relief.").

As mentioned above, temporary injunctive relief is just and proper if the circumstances of the case demonstrate that "there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted," *Sharp*, 225 F.3d at 1135, or to preserve the status quo, *Angle*, 382 F.2d at 660.  Petitioner has presented evidence that despite the NLRB's charge against Respondent, and despite the ALJ's decision ruling against Respondent, Respondent has continued the same conduct forming the basis of the charge and the ALJ's decision: excluding Longmont Unit RNs from a systemwide wage increase.  Without a cease-and-desist order, Respondent is free to continue its conduct (that has already been determined to be unlawful by the ALJ) during the pendency of this action before the Board, the resolution of which could take years.  *See Arlook*, 952 F.2d at 372 (explaining that injunctive relief becomes just and proper when, *inter alia*, "the violations reasonably found to have been committed will be repeated absent an injunction"). Furthermore, Respondent does not make any argument explaining why a cease-and-desist order is not just and proper, *see generally* [Doc. 29], and any burden on Respondent from a cease-and-desist order would be "minimal in that this relief merely orders it to obey the law and not engage in specific unfair labor practices."  *Drew-King v. Deep Distribs. of Greater NY, Inc.*, 194 F. Supp. 3d 191, 201 (E.D.N.Y. 2016).

The Court notes Respondent's position that it was and is legally required to maintain the "status quo" with respect to the Longmont Unit RNs' wages in order to not unfairly influence the election or bargaining process.  *See* [Doc. 29 at 7–11]; *see also, e.g.*, *United Pulse Trading*, 370 NLRB No. 134, 2021 WL 2764204 (June 10, 2021) ("In order not to unfairly influence a union election, the employer must maintain the pre-union *status quo* respecting employee benefits.").

But the election is now over, and the bargaining process has yet to formally begin.  Furthermore, because this Court has now *ordered* Respondent to cease and desist from excluding Longmont Unit RNs from future systemwide, incremental wage or benefits increases (as opposed to Respondent electing to voluntarily increase the Longmont Unit RNs' wages), any concern that the Board will infer improper motive on the part of Respondent should be allayed.

Accordingly, the Court will order Respondent to cease and desist from excluding Longmont Unit RNs from future systemwide or normal incremental wage or benefits increases from the date of this Order forward.  To be clear, as explained above, the Court **does not** order Respondent to raise the Longmont Unit RNs' wages to the level they would have been but for the previous exclusions of these nurses from Respondent's wage increases.  Instead, the Court orders Respondent to cease and desist from excluding Longmont Unit RNs from commensurate future incremental wage and/or benefits increases applicable to all nurses systemwide.  Absent this relief, Respondent will be free to continue the conduct that the ALJ has deemed unlawful, which would frustrate the purposes of the Act.  *See D'Amico ex rel. NLRB v. U.S. Serv. Indus., Inc.*, 867 F. Supp. 1075, 1091–92 (D.D.C. 1994) (finding that cease-and-desist order directing employer to refrain from further unlawful conduct was appropriate where the Board presented evidence that the respondent had violated and would continue to violate the NLRA).  In addition, such an order furthers the purpose of preserving the status quo pending final resolution from the Board—either measured from before the first exclusionary increase, where all Longmont Unit RNs were included in Respondent's systemwide incremental wage increases, or measured from the date of the ALJ's decision, when the ALJ concluded that Respondent had violated the NLRA by excluding Longmont Unit RNs from systemwide increases.

Furthermore, the Court agrees that, for this Order to have appropriate effect, Respondent must ensure that its employees are informed of this Order, and finds that ordering Respondent to inform its employees of this Court's Order is an appropriate remedy. *See King*, 2022 WL 17083273, at *9 ("[C]ourts have included the reading and posting of court orders within the temporary injunctive relief awarded under Section 10(j)"); *Murphy v. NCRNC, LLC*, 474 F. Supp. 3d 542, 563 (N.D.N.Y. 2020) (describing the reading and posting of a court order as "traditional remedies"). However, Petitioner provides no explanation as to why it is just and proper for the Court to order Respondent to hold in-person meetings at which the Court's order will be read aloud to employees. *See* [Doc. 1 at 15–16]. Indeed, Petitioner has given the Court no basis from which the Court could conclude that such a request is feasible, let alone just and proper. Nor has Petitioner explained why this Court should require that the Court's Order be posted "at all of Respondent's facilities in Colorado and Western Kansas," [*id.* at 16], given that it appears that the Longmont Unit RNs all work at Longmont Hospital, *see* [Doc. 1-3 at 220].

Accordingly, the Court will order Respondent to post this Order at Longmont Hospital, in all places where Respondent typically posts notices to its employees, and maintain the posting(s) throughout the pendency of this matter, and send a copy of the Order to all of its employees, regardless of where its employees work, via email. *See* [Doc. 1-6 at 246:25–247:3 (Ms. Roberts explaining at the administrative hearing that Respondent sent the wage-increase announcements to all associates because Respondent does not "have the capability to send emails only to the impacted associates")]. Further instructions on the dissemination of this Order are set forth below.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that the Petition for Temporary Injunction Pursuant to Section 10(j) of the National Labor Relations Act [Doc. 1] is **GRANTED in part** and

**DENIED in part**.  It is hereby **ORDERED** that, pending the final disposition of the matters before the National Labor Relations Board in Case No. 29-CA-291664, Respondent, including its officers, representatives, supervisors, agents, employees, attorneys, and all persons acting on its behalf or in participation with it, shall:

(1)     Cease and desist from:

      a.     Excluding Longmont Unit RNs from commensurate future systemwide wage, bonus, or benefits increases from the date of this Order forward, on the basis that Respondent must maintain the "status quo" during bargaining efforts; and

      b.     In any like or related manner unlawfully interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under Section 7 of the Act; and

(2)     Take the following affirmative steps:

      a.     Within **fourteen days** of the date of this Order, post a copy of this Order (in English and in other languages as necessary to ensure effective communication to Respondent's employees, said translations to be paid for by Respondent and approved by the Regional Director of Region 27) at Longmont United Hospital where Respondent typically posts notices to its employees; maintain such postings during the pendency of the Board's final disposition of the matters before it in Case No. 29-CA-291664; and grant to agents of the Board reasonable access to its worksite to monitor compliance with this posting requirement;

      b.     Within **fourteen days** from the date of this Order, distribute copies of this Order (including translations in other languages as necessary to ensure effective communications to Respondent's employees, said translations to be paid for by Respondent and approved by the Regional Director of Region 27 of the NLRB), to all employees via email and all other intranet or internet sites or applications that Respondent uses to communicate with its employees; and

      c.     Within **twenty-one days** of the issuance of this Order, file with this Court and serve upon Petitioner a sworn affidavit setting forth with specificity the manner in which Respondent has complied with this Order.

DATED:  November 16, 2023           BY THE COURT:

                                      Nina Y. Wang
                                      United States District Judge